UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
RAFAEL NUNEZ HENRIQUEZ,

                    Plaintiff,

                                        MEMORANDUM & ORDER
         -against-                      15-CV-2655(JS)

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

                    Defendant.
--------------------------------------X
APPEARANCES
For Plaintiff:      Craig Joseph Tortora, Esq.
                    Goldsmith & Tortora
                    2067 Jericho Turnpike
                    Commack, New York 11725

For Defendant:      Candace Scott Appleton, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201

SEYBERT, District Judge:

         Rafael  Nunez  Henriquez  ("Plaintiff")  brought  this

action against the Acting Commissioner of Social Security (the

"Commissioner")  challenging  the  Commissioner's  decision  that

Plaintiff  is  not  disabled  and  thus  not  entitled  to  disability

insurance benefits.   The parties have cross-moved for judgment

on  the  pleadings.   Plaintiff  asserts  that  the  case  must  be

remanded  for  a  benefits  calculation  or,  alternatively,  for

further development of the record.   For the following reasons,

1

the Commissioner's motion is GRANTED, and Plaintiff's motion is DENIED.

<u>BACKGROUND</u>

Plaintiff applied for disability benefits on August 22, 2012, claiming a disability due to neck and back pain, headaches, and depression. (R. 14.)[1] Plaintiff had been injured while working as a groundskeeper on July 14, 2011. (R. 152-53.)

After his application was denied on March 6, 2013, Plaintiff requested a hearing before an administrative law judge, which took place on December 9, 2013 before April M. Wexler (the "ALJ"). (R. 14.) The ALJ heard testimony from Plaintiff, who was aided by a Spanish interpreter, and Rocco J. Meola, a vocational expert. (R. 14, 18.)

On January 10, 2014, the ALJ issued her decision finding that Plaintiff is not disabled. (R. 22.) The ALJ's decision became final when the Appeals Council denied Plaintiff's request for review, stating that it "found no reason under [its] rules to review the Administrative Law Judge's decision." (R. 1.)

Plaintiff then brought this action against the Commissioner. The salient details are discussed below.

---

[1] The abbreviation "R." refers to the administrative record. (Docket Entry 6.)

I.   Evidence Presented to the ALJ

   A.   Testimonial Evidence

      Born in 1973 in the Dominican Republic, Plaintiff has been living in the United States for approximately thirteen years. (Pl.'s Br., Docket Entry 9, at 3; R. 34.)   He lives in New York with his mother and his wife and four children.   (R. 33.)   He previously worked as a groundskeeper for a golf course and then later for a landscaping company.   (R. 35–36.)

      Plaintiff has not been able to work since he injured his back in July 2011.   (R. 18.)   He testified that he suffers from "[a] lot of back pain" and "cannot exert [him]self." (R. 37.)   He also complained of headaches and dizziness. (R. 37.)   He stated that the headaches are caused by his neck pain.   (R. 43 (indicating that "[t]he neck pain goes up to [Plaintiff's] head").)   He elaborated by saying that the neck pain then "moves through [his] head."   (R. 43.)

      Plaintiff testified that he receives chiropractic treatment for his physical ailments and that he also takes several medications to manage his pain and to help him sleep. (R. 37–41.)   He also said that he uses a neck collar at night and wears a back brace during the day.   (R. 43.)   He received epidural injections in his back on multiple occasions but later discontinued using them.   (R. 42.)

In addition to his physical ailments, Plaintiff testified that he suffers from depression. (R. 46.) He said that he sometimes "lose[s] [his] control with [his] wife and kids." (R. 46.) He further testified that he takes medication and is seeing both a psychologist and a psychiatrist for treatment of his depression. (R. 46.)

Plaintiff also discussed how his physical and mental ailments affect his day-to-day life. (R. 43–46.) Each morning, he gets up and takes his medications. (R. 43.) He then watches television. (R. 43.) He frequently stands up because he "can't continue with sitting." (R. 43.) He sometimes naps during the day. (R. 43.) He can shower and dress himself. (R. 43.) He cannot cook for himself because if he is "standing for an extended period of time, then [he] start[s] to feel [back pain]." (R. 44.) Plaintiff also said that he does not help around the house, nor does he help with food shopping. (R. 44.) He reported that he spends "very, very little" time with his children. (R. 45.) Plaintiff sometimes leaves the house to attend therapy sessions and medical appointments. (R. 45.) He also leaves the house to eat out approximately once per month. (R. 45.) Plaintiff socializes with friends and family about every two months. (R. 45.) He has also traveled to the Dominican Republic since his accident. (R. 45.)

The ALJ questioned Plaintiff about how his physical and mental conditions affect his ability to work. (R. 47.) He said that even if a job allowed him to alternate between sitting and standing, he could experience a problem if he suddenly overexerted himself. (R. 47.) He also testified that his medication is a problem, as it puts him in a drowsy state. (R. 47.)

Mr. Rocco J. Meola, a vocational expert, also appeared and testified. (R. 48–52.) Mr. Meola described Plaintiff's past work as groundskeeping and lawn maintenance. (R. 49.) He reported that Plaintiff's previous work was medium in terms of its physical demands and did not require extensive training. (R. 49.)

Among other things, the ALJ asked Mr. Meola to consider a hypothetical individual who was limited to sedentary work. (R. 50.) This hypothetical individual had the following limitations: occasionally lift ten pounds; sit for up to six hours; stand or walk for approximately two hours in an eight-hour day with normal breaks; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance and stoop; never kneel, crouch, or crawl; and simple work-related decisions and few workplace changes. (R. 50.) Mr. Meola testified that there are jobs in the national economy in substantial numbers that are compatible with these

limitations. (R. 50.) Although Plaintiff could not perform his past relevant work, he could perform other work based on his residual functional capacity ("RFC"), or "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). In fact, Plaintiff could find a job as a table worker, a scale operator, or a preparer. (R. 21.) Mr. Meola also testified that the sedentary-level jobs he identified could be performed by an individual who required stretching breaks of up to four minutes per hour. (R. 50-51.) He said that the jobs could not be performed by an individual who needed to be absent from work three to four times per month. (R. 51.) He also said that none of the jobs could accommodate a sit-stand option. (R. 52.) Finally, none of the jobs could accommodate a person who required a ten-minute break every thirty minutes. (R. 52.)

B. <u>Medical Evidence</u>[2]

Plaintiff's disability allegedly began on July 14, 2011. (R. 152.) The next day, a cervical spine CT-scan showed no acute fracture or subluxation and degenerative

---

[2] Plaintiff does not appear to challenge the ALJ's findings as to his mental impairment. Nevertheless, the Court accepts the findings as well-supported by the record. Dr. Paul Herman, a consultative psychiatrist, evaluated Plaintiff in February 2013 and found that while Plaintiff had psychiatric problems, the problems were not severe enough to prevent him from working. (R. 275.) Dr. E. Charles, a state agency psychiatric consultant, also found that Plaintiff retained the mental abilities and social skills for performing simple tasks. (R. 66-67.)

changes.  (R. 245.)  Approximately one month later, Plaintiff underwent a cervical spine MRI which showed a herniation at the C5-C6 disc space, impressing the ventral cord, and a bulge at C3-C4, impressing on the thecal sac.  (R. 224.)  That same day, Plaintiff had a lumbar spine MRI performed.  (R. 194.)  It showed left lateral recess stenosis at the L5-S1 disc space, due to a left disc herniation with hypertrophy of the facets, and L1/2-L to L4/5 disc bulging and hypertrophy of the facets.  (R. 194.)

### 1.  Timothy Groth, M.D.

Plaintiff began seeing Dr. Timothy Groth, a pain management specialist, in August 2011.  (R. 211–14.)  Plaintiff reported pain in his back, neck, shoulders, legs, and head. (R. 211, 213.)  He indicated that his pain without medication was extreme and unbearable.  (R. 213.)  Plaintiff reported that the medications he was taking at the time relieved his pain. (R. 212–13.)

Dr. Groth physically examined Plaintiff.  (R. 214.) Dr. Groth noted that Plaintiff had tenderness over the occipital nerve outlets with reproduction of pain to the eyes.  (R. 214.) There was also significant spinal tenderness, bilateral neuroforaminal compression testing, palpable trigger points bilaterally, weakness in the left grasp, and decreased sensation in the left C6 dermatome.  (R. 214.)  Dr. Groth's examination of

the lumbar spine showed flexion to sixty degrees and extension to neutral. (R. 214.) There was also significant spinal tenderness. (R. 214.) Finally, the right-sided straight leg raise was positive, and there was weakness in the right extensor hallucis longus. (R. 214.) Dr. Groth ultimately diagnosed the following conditions: cervical myofascial pain, occipital neuralgia, cervical disc herniation, cervical radiculopathy, lumbar disc herniation, and lumbar radiculopathy. (R. 214.) He gave Plaintiff an occipital nerve block injection, and he prescribed pain medication. (R. 210, 214.)

Nine days after his initial appointment with Dr. Groth, Plaintiff saw him again. (R. 209.) Dr. Groth noted that there was minimal tenderness over the occipital nerves. (R. 209.) Cervical range of motion and sensation in all fingers were decreased. (R. 209.) Plaintiff reported that his headaches were less severe. (R. 209.) Dr. Groth diagnosed a cervical herniated disc with radiculopathy and again prescribed pain medication. (R. 209.) He instructed Plaintiff to obtain clearance from a neurologist so that an epidural steroid injection ("ESI") could be administered. (R. 209.)

Dr. Groth saw Plaintiff again in September, October, November, and December 2011 and January and March 2012 for continued, symptomatic treatment of his pain. (R. 202–08.) Dr. Groth administered cervical ESIs in September and December

and lumbar ESIs in September and October. (R. 202.) Dr. Groth changed Plaintiff's pain medication in October 2011 and continued renewing the prescription until Plaintiff was discharged from treatment on March 3, 2012. (R. 202.) Dr. Groth did not perform any more of the ESIs after December 2011.

### 2. Raj Tolat, M.D.

Dr. Tolat saw Plaintiff for electromyographic ("EMG") testing on September 8, 2011 while Plaintiff was still seeing Dr. Groth for management of his pain. (R. 195–201.) Testing of the lower extremities revealed left-sided L5 radiculopathy, and testing of the upper extremities was consistent with left-sided C6 radiculopathy. (R. 195, 198.)

### 3. Joseph T. Sanelli, D.O.

Plaintiff began seeing Dr. Joseph T. Sanelli, a physical medicine and rehabilitation physician at Long Island Spine Specialists, two months after being discharged from Dr. Groth's care. (R. 225.) Dr. Sanelli gave Plaintiff a physical therapy order for treatment of cervical disc displacement without myelopathy, lumbar facet syndrome, and discogenic syndrome. (R. 225.) Plaintiff began receiving physical therapy at Port Jefferson Physical Therapy ("PJPT") at the end of May 2012. (R. 230-43.) Plaintiff completed an initial questionnaire on which he reported that his symptoms had decreased since the accident in July 2011. (R. 243.) In the

course of his therapy, Plaintiff usually complained of pain in his lower back and legs or hamstrings. (R. 230–243.) After completing seventeen treatment sessions and exhausting his insurance, Plaintiff was discharged from PJPT's care and was instructed on self-management with a home exercise program. (R. 226.)

### 4. Kevin Strasser, D.C.

Dr. Kevin Strasser, Plaintiff's chiropractor, completed a questionnaire in 2013 about his treatment of Plaintiff from July 2012 to February 2013. (R. 266–72.) He reported that he began treating Plaintiff for intermittent pain in the lower back, neck, and arm. (R. 266.) Dr. Strasser noted that Plaintiff initially needed treatment three times per week, then only two times a week by November 2012, and then only once per week by January 2013. (R. 267.) Plaintiff's initial symptoms included the following: muscle spasm; positive straight-leg raise; positive cervical compression; sensory changes; and reduced lumbar and cervical spine ranges of motion. (R. 267.) At the time of his final visit in February 2013, Plaintiff exhibited only: mild muscle spasms in the neck and shoulders; normal cervical range of motion; mild loss of lumbar flexion; no gait changes; negative cervical compression; and negative straight-leg raise. (R. 267.) Plaintiff was able to squat and pick up weights without pain. (R. 267.) Dr. Strasser

noted that treatment had gone well, and he opined that Plaintiff could return to work in March 2013. (R. 267.) He stated that Plaintiff had no limitations in sitting, standing, or walking. (R. 269.) Plaintiff could lift or carry up to ten pounds frequently, and he could lift a maximum of fifty pounds. (R. 269.) He had no limitations in pushing or pulling, but Dr. Strasser did note that Plaintiff should not be bent over for long periods of time. (R. 271.)

Dr. Strasser also referred Plaintiff to a neurologist, Dr. Scott McWilliams, for a visit in February 2013. (R. 292–93.) Dr. McWilliams did not find any problems other than back pain and declined to prescribe medication after Plaintiff showed him "medications from five different medical providers and three different area codes." (R. 292–93.)

### 5. Thomas J. Dowling, M.D.

Plaintiff returned to Long Island Spine Specialists for a follow-up with Dr. Thomas J. Dowling in October 2012, two months after completing the physical therapy prescribed for him by Dr. Sanelli. (R. 289–91.) Plaintiff reported that his neck, thoracic, lower back pain, and headaches remained constant and unchanged despite the fact that he was showing improvement with Dr. Strasser. (R. 289.) He said that he had gone to the emergency room the month before because of pain in his neck and headaches. (R. 289.) He also reported pain in the left

shoulder and numbness in both arms and hands and his right leg and foot. (R. 289.) He said that he was receiving chiropractic care which was helping with his pain and taking pain and sleep medication. (R. 289.) On examination, Plaintiff had restricted range of motion in the cervical spine with spasm. (R. 290.) The lumbar spine had a reduction in range of motion, but no spasm. (R. 290.)

Dr. Dowling diagnosed Plaintiff with the following: disc displacement without myelopathy, cervical; disc displacement without myelopathy, lumbar; discogenic syndrome; and facet syndrome. (R. 291.) Dr. Dowling ordered continued chiropractic treatment. (R. 291.) Dr. Dowling opined that Plaintiff's impairment was "total temporary" and that he was unable to resume his normal work at that time. (R. 291.) However, Dr. Dowling made no indications as to whether or not the Plaintiff could perform other work. (See generally R. 289–91.)

6. Mehran Golpariani, M.D.

Around the same time Plaintiff followed up with Dr. Dowling, he also began seeing Dr. Mehran Golpariani, a pain management specialist. (Def.'s Br., Docket Entry 13, at 9.) On examination, Dr. Golpariani noted reduced range of motion in the cervical spine. (R. 299.) There was bilateral paraspinal tenderness, but no spinal tenderness or spasms. (R. 299.)

12

Plaintiff's lumbar spine had reduced flexion and hyperextension and tenderness, but no spasms. (R. 299.) Straight leg raising was positive on the left at forty-five degrees and negative on the right. (R. 299.) Dr. Golpariani diagnosed lumbar and cervical herniated discs, lumbar facet hypertrophy, and occipital neuralgia. (R. 299.) For treatment, he administered a lumbar ESI and prescribed pain medication. (R. 299.) Dr. Golpariani administered additional lumbar ESIs twice in November 2012 and Plaintiff reported obtaining good relief of his pain both times. (R. 294-95, 300-01.)

Plaintiff saw Dr. Golpariani again in December and reported that the ESIs and pain medication were helping his neck and back pain. (R. 302.) Dr. Golpariani's examination disclosed that Plaintiff's lumbar spine still had reduced ranges of motion and tenderness and again, there were no spasms. (R. 302.) Plaintiff continued to have reduced range of motion in the cervical spine with fight paraspinal tenderness and no spinal tenderness or spasms. (R. 302.) Straight leg raising was now positive on the right at sixty degree, and negative on the left. (R. 302.) Dr. Golpariani did not change his diagnoses. (R. 302.) Plaintiff did not want another cervical ESI. (R. 302.)

Plaintiff next saw Lauren Morasse, one of Dr. Golpariani's physician assistants, in January and February 2013.

(R. 303-04.) During the January visit, Plaintiff reported severe pain when he did not take pain medication. (R. 303.) He reported having pain in his right leg which worsened at night. (R. 303.) Ms. Morasse's examination findings were the same as Dr. Golpariani's findings from the December visit, and the diagnoses remained unchanged. (R. 303.) Ms. Morasse again prescribed pain medication and an occipital nerve block. (R. 303.)

During the February visit, Plaintiff noted his pain with medication was relatively minor. (R. 304.) However, he reported that he now had pain in his shoulder blades and right arm. (R. 304.) Examination disclosed tenderness in the posterior shoulder, but no more paraspinal tenderness in either the cervical or lumbar spine. (R. 304.) There was still reduced range of motion in both the cervical and lumbar spines and tenderness in the lumbar spine. (R. 304.)

Plaintiff saw Ms. Morasse for follow-ups in March, April, and June 2013. (R. 305-06, 309.) During the March visit, Plaintiff declined further ESIs. (R. 305.) Other than the return of paraspinal tenderness in both the cervical and lumbar spines, examination findings remained the same, as did the diagnoses. (R. 305.) During the April visit, Plaintiff noted that his back pain with medication was trivial. (R. 306.) Examination findings remained unchanged, as did the diagnoses,

but another lumbar ESI was prescribed despite Plaintiff's improvement. (R. 306.) During the June visit, Plaintiff reported that his pain had increased but was still relatively minor. (R. 309.) Examination findings and diagnoses were the same as before. (R. 309.) Plaintiff complained that the relief provided by the ESIs was only temporary and declined any more of them. (R. 309.)

Plaintiff saw a new physician assistant, Jenna LaRocca, in Dr. Golpariani's office in August, September, November, and December 2013. (R. 310–13.) Plaintiff reported during the August visit that his medication alleviated his pain and made it tolerable. (R. 310.) Examination findings and diagnoses remained unchanged, and an ESI was again refused. (R. 310.) During the September visit, Plaintiff again reported that his medication helped his pain, and he said that he would consider resuming ESIs the following month. (R. 311.) Plaintiff reported at the November visit that he was using traction at home for his neck pain, and he had also started using topical pain-relief patches. (R. 312.) Both helped relieve his pain. (R. 312.) During the December visit, Ms. LaRocca noted that Plaintiff was being weaned off of using a lumbar support brace. (R. 313.) It is unclear whether this was the brace he was wearing at the hearing in front of the ALJ the following month. In any event, examination findings and

diagnoses again remained unchanged during the September, November, and December visits. (R. 311–13.)

   7.   Marisela Gomez, M.D.

   On February 19, 2013, Plaintiff was consultatively examined by Dr. Marisela Gomez, a preventative medicine specialist. (R. 260–64.) Plaintiff reported that he has had neck pain radiating to his head, lower back pain, and shoulder pain since a car accident. (R. 260.) He also reported numbness in his hands and right foot. (R. 260.) He said he had been diagnosed with depression and insomnia. (R. 260-61.) Plaintiff reported that his daily activities included showering, dressing, watching television, listening to the radio, socializing with friends, and going out only when necessary. (R. 261.) He said that he could not cook, clean, do laundry, shop, or do child care because he could not stand for a long time. (R. 261.) Dr. Gomez's physical examination revealed that Plaintiff's gait and stance were normal and that he was able to walk on his heels and could fully squat. (R. 261.) He did not need help to change for the examination or to rise from the exam table. (R. 262.) His cervical spine ranges of motion were: flexion, extension, and lateral flexion to thirty-five degrees each; and rotation to sixty degrees bilaterally. (R. 262.) His lumbar spine ranges of motion were: flexion to thirty degrees and extension to ten degrees; lateral flexion and extension were full bilaterally.

(R. 262.)   Plaintiff declined to do straight-leg raising from the supine position because of pain.   (R. 262.)   Sitting straight-leg raising was positive at ten degrees bilaterally. (R. 262.)   There was full range of motion in the shoulders bilaterally.   (R. 262.)   Hips showed flexion and extension seventy-five degrees bilaterally; rotation, backward extension, abduction, and adduction were full bilaterally.   (R. 262.) Knees showed flexion and extension 100 degrees bilaterally. (R. 262.)   There was full range of motion in the ankles. (R. 262.)   Plaintiff's joints were stable and nontender and showed no signs of swelling.   (R. 262.)   The neurological examination was normal and showed full motor strength, equal deep tendon reflexes, and no sensory deficits.   (R. 263.)   The lumbosacral region was x-rayed, revealing straightening.   (R. 265.)   Dr. Gomez diagnosed the following: head and neck pain; shoulder pain; lower back pain; numbness in both hands and the right foot; depression; and insomnia.   (R. 263.)   In her opinion, Plaintiff had moderate limitations for walking, standing, and bending for long periods.   (R. 263.)   Dr. Gomez also found a mild limitation for pushing, pulling, lifting, and carrying heavy objects.   (R. 263.)   Dr. Gomez's findings appear to be consistent with the record, which shows Plaintiff's slow but steady improvement in the years following the July 2011 accident.

## II.  The Decision of the ALJ

After reviewing the record, the ALJ issued her decision on January 10, 2014, finding that Plaintiff is not disabled.  (R. 8-25.)  The ALJ concluded that while Plaintiff had severe impairments and could not perform any of his past relevant work, he retained the RFC to perform sedentary work. (R. 16-17, 21.)  The ALJ further concluded that there are a substantial number of jobs in the national economy that are compatible with Plaintiff's limitations.  (R. 21.)

## III. This Appeal

Plaintiff commenced this appeal on May 8, 2015. (Docket Entry 1.)  The Commissioner filed the administrative record on August 5, 2015 and her answer two days later.  (Docket Entries 6, 7.)  On October 19, 2015, Plaintiff moved for judgment on the pleadings, and on December 18, 2015, the Commissioner cross-moved for judgment on the pleadings.  (Docket Entries 9, 12.)  These motions are presently before the Court.

### DISCUSSION

## I.  Standard of Review

In reviewing the ALJ's ruling, the Court must determine whether the ALJ's findings are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard."  Persico v. Barnhart, 420 F. Supp. 2d 62, 70 (E.D.N.Y. 2006) (internal quotation marks and citation

omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003) (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971)). The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions drawn from such facts. See id. Thus, if the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld. See id. In other words, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ. See Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the [Commissioner], not [a reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.").

To determine whether substantial evidence supports the ALJ's findings, this Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted) (per curiam). Ultimately, "[t]he findings of the Commissioner of Social Security as to any fact, if supported

by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).

A.  <u>Eligibility for Benefits</u>

A claimant must be disabled within the meaning of the Social Security Act (the "Act") to receive disability benefits. See <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); 42 U.S.C. § 423(a)&(d).  A claimant is disabled under the Act when he can show an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920.  <u>First</u>, the Commissioner considers whether the claimant is currently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  <u>Second</u>, the Commissioner considers whether the claimant suffers from a "severe medically determinable physical or mental impairment" or a severe combination of impairments that satisfy

the duration requirement set forth at 20 C.F.R. § 404.1509.[3]  20 C.F.R. § 404.1520(a)(4)(ii).  <u>Third</u>, if the impairment is "severe," the Commissioner must consider whether the impairment meets or equals any of the impairments listed in Appendix 1 of the Social Security regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  "These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  <u>Dixon v. Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995).  <u>Fourth</u>, if the impairment or its equivalent is not listed in the Appendix, the claimant must show that he does not have the RFC to perform tasks required in his previous employment.  20 C.F.R. § 404.1520(a)(4)(iv).  <u>Fifth</u>, if the claimant does not have the RFC to perform tasks in his or her previous employment, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform.  20 C.F.R. § 404.1520(a)(4)(v).  If not, the claimant is disabled and entitled to benefits.

Plaintiff bears the burden on the first four steps, but then the burden shifts to the Commissioner for the last step.  <u>Selian v. Astrue</u>, 708 F.3d 409, 418 (2d Cir. 2013).  "In

[3] 20 C.F.R. § 404.1509 provides that "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."

making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Boryk ex rel. Boryk v. Barnhart, No. 02-CV-2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003) (citation omitted).

Here, the ALJ performed the above analysis and found that Plaintiff had not engaged in substantial gainful activity since July 14, 2011, the alleged onset date of the disability. (R. 16.) The ALJ then found that Plaintiff had the following severe impairments: a lumbar syndrome, headaches, and depression. (R. 16.) The ALJ next determined that none of Plaintiff's impairments or any combination of his impairments are the medical equivalent of any impairment enumerated in Appendix 1 of the Regulations. (R. 16.) The ALJ then found that although Plaintiff was incapable of performing his past work as a groundskeeper, he had the RFC to perform sedentary work with some minor limitations. (R. 21, 17.) Using Part 404, Subpart P, Appendix 2 of the Medical-Vocational Guidelines as a framework for decision-making and the testimony of Mr. Meola, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

(R. 21.)    The  ALJ  thus  concluded  that  Plaintiff  was  not

disabled.  (R. 22.)

The  Court  must  now  determine  whether  the  ALJ's

decision is supported by substantial evidence.  The Commissioner

and Plaintiff have both moved for judgment on the pleadings, and

each  party  has  raised  several  arguments  in  support  of  their

respective  motions.    The  Court  will  address  each  argument  in

turn.

B.    Severe Impairments

Plaintiff  first  argues  that  the  ALJ  erred  in  her

application  of  the  de  minimis  standard  at  step  two.    (Pl.  Br.

at 5.)  Specifically, Plaintiff argues that the ALJ incorrectly

found  the  neck  impairment  to  be  non-severe  and  failed  to

consider  the  neck  impairment  as  part  of  the  RFC.    (Pl.'s  Br.

at 5 (citing an EMG study, an MRI report, a CT scan, and

physical  examinations).)    This  argument  is  belied  by  a  full

reading  of  the  ALJ's  opinion.    By  recognizing  Plaintiff's

headaches  as  a  severe  impairment,  the  ALJ  was  essentially

determining  that  Plaintiff's  neck  problems  were  a  severe

impairment  as  well.    During  his  appearance  before  the  ALJ,

Plaintiff  stated  that  his  "neck  pain  .  .  .  goes  up  to  [his]

head"  and  then  the  neck  pain  "moves  through  [his]  head."

(R. 43.)    Furthermore,  as  the  Commissioner  argues,  the  ALJ

explicitly  referred  to  the  cervical  MRI  and  EMG  testing  in  her

decision, which shows that the ALJ was aware of the medically determinable neck impairment.  (R. 18.)

Additionally, the Commissioner correctly argues that once a case proceeds past step two, "the determination of whether a specific impairment is severe or non-severe becomes irrelevant because the ALJ must consider the combined impact of all impairments, even those that are not severe."  (Def.'s Br. at 18 (citing 20 C.F.R. § 404.1523).)  In her decision, the ALJ specifically noted that in determining Plaintiff's RFC, she considered all of Plaintiff's impairments, including those not found to be severe.  (R. 15.)  Plaintiff has not indicated what additional neck-related limitations the ALJ should have found that are not already incorporated into her decision. Accordingly, Plaintiff's argument that the ALJ failed to properly evaluate his neck impairment is without merit.

C.   Plaintiff's RFC

The ALJ found that Plaintiff has the capacity to perform sedentary work as defined in 20 CFR 404.1567(a). (R. 17.)  Specifically, the ALJ found that Plaintiff has the RFC to perform the following jobs, all of which exist in substantial numbers in the national economy: a table worker, a scale operator, and a preparer.  (R. 21.)  Plaintiff makes two primary arguments in challenging the ALJ's RFC determination: (1) that the RFC determination is not supported by substantial evidence

and (2) that the ALJ improperly evaluated Plaintiff's credibility as to his subjective complaints. (Pl. Br. at 6-11.) Both arguments are meritless.

### 1. Substantiality of the Evidence

Plaintiff first argues that substantial evidence does not support the ALJ's RFC determination. (Pl. Br. at 6-10.) The Court, however, finds that the ALJ's decision is supported by substantial evidence from the opinions of various doctors, the medical records, Plaintiff's own testimony, and the findings of other sources, such as Dr. Strasser, a chiropractor, and Drs. Gomez and Dowling, consultative examiners.

As this Circuit has recognized, "[i]t is within the province of the ALJ to weigh conflicting evidence in the record and credit that which is more persuasive and consistent with the record as a whole." Banks v. Astrue, 955 F. Supp. 2d 178, 188 (W.D.N.Y. 2013) (citations omitted). In that regard, the ALJ is free to consider other sources, or those that are not traditional medical sources such as physicians or psychologists. Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995); see also 20 C.F.R. § 404.1513(e) (cataloging examples of other sources, including chiropractors and physicians' assistants); accord SSR 06-3p, 2006 WL 2329939, at *2-3 (providing that in considering the opinions of sources who are not "acceptable medical sources," the ALJ will consider the same pertinent factors set

forth in 20 C.F.R. § 404.1527(d)). Likewise, the ALJ has discretion to weigh the testimony of consultative examiners and attribute the appropriate weight based on the entire record. Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order); Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) ("[T]he report of a consultative physician may constitute [substantial] evidence.").

In this case, the ALJ afforded greater weight to the opinions of four doctors: Drs. Strasser, Golpariani, Gomez, and Dowling. (R. 19.) Dr. Strasser, a chiropractor, determined that Plaintiff had no limitations with regard to sitting, standing, or walking. (R. 19.) He also opined that Plaintiff could lift or carry up to ten pounds frequently. (R. 19.) Dr. Strasser's opinions are consistent with the ability to do sedentary work. The ALJ properly afforded his opinion great weight because of how frequently he treated Plaintiff and because Dr. Dowling, an orthopedist, endorsed Dr. Strasser's services. (R. 19.)

Dr. Golpariani's assessment buttressed the findings of Dr. Strasser. (R. 19.) Dr. Gopariani's treatment notes reflect Plaintiff's gradual improvement during his time in Dr. Golpariani's care. Specifically, Dr. Golpariani's notes show that Plaintiff's medication helped his pain, and Plaintiff went

from requiring injections to assuage his pain to managing it with less invasive methods. (R. 306, 310–11.)

That determination is also consistent with the opinion of Drs. Gomez and Dowling, two consultative examiners. (R. 19.) Dr. Gomez noted that Plaintiff's gait was normal and that he was able to walk on his heels and fully squat. (R. 19.) Dr. Gomez determined that Plaintiff had "moderate limitation[s] for walking, standing, and bending for long periods." (R. 263.) Courts in this Circuit and elsewhere have concluded that a claimant can perform light or medium work based on "an opinion assessing moderate limitations for sitting, standing and walking." Harrington v. Colvin, No. 14-CV-6044, 2015 WL 790756, at *14 (W.D.N.Y. Feb. 25, 2015) (collecting cases); see also Nelson v. Colvin, No. 12-CV-1810, 2014 WL 1342964, at *12 (E.D.N.Y. Mar. 31, 2014). Thus, Dr. Gomez's determination reinforces the conclusion that Plaintiff was capable of sedentary work. (R. 19.)

The ALJ also relied on Dr. Dowling's opinion that Plaintiff's impairment was "temporary." (R. 291.) Although Dr. Dowling stated that Plaintiff was unable to return to his work as a groundskeeper, the doctor did not rule out all job opportunities. See Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) ("The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say.")

(citations omitted). Together, the opinions of Drs. Gomez and Dowling support the ALJ's RFC finding.

The ALJ's RFC determination is also supported by substantial evidence from the medical records. The neurological examination conducted by Dr. Gomez was normal and showed full motor strength, equal deep tendon reflexes, and no sensory deficits. (R. 263.) At the time of his final visit with Dr. Strasser in February 2013, Plaintiff exhibited only the following problems: mild muscle spasms in the neck and shoulders, normal cervical range of motion, mild loss of lumbar flexion, no gait changes, negative cervical compression, and negative straight-leg raise. (R. 267.) Also at the time of that final visit, Plaintiff was able to squat and pick up weights without pain. (R. 267.) While Plaintiff cites medical records to the contrary, the Court notes that these citations come from the medical tests that were conducted soon after Plaintiff's July 2011 accident. (See Pl.'s Br. at 5.) The rest of the medical records are consistent with Plaintiff's gradual improvement in the years since his accident.

In his opposition, Plaintiff argues that the ALJ overstated Plaintiff's vocational factors at step five. (Pl.'s Br. at 11–14.) Here, the ALJ found that Plaintiff "has at least a high school education and is able to communicate in English." (R. 21.) Plaintiff claims that he has a marginal education and

a limited grasp on the English language. (Pl.'s Br. at 14.) However, these arguments contradict the evidence in the record. Although Plaintiff states that he spoke and read "[v]ery little" English, he conceded that he passed the United States citizenship examination in English. (R. 34–35.) Therefore, this argument is meritless, and the Court finds that the ALJ's RFC determination is supported by substantial evidence.

## 2. Subjective Complaints

Plaintiff also challenges the ALJ's determination that his statements about the intensity, persistence, and effects of his symptoms were "not entirely credible." (R. 20.) For the following reasons, however, the Court finds no error in the ALJ's credibility determination.

The Second Circuit has held that "the subjective element of pain is an important factor to be considered in determining disability." Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984). However, "[t]he ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 705 (2d Cir. 1980) (alteration in original) (internal quotation marks and citation omitted). The Court will uphold an ALJ's decision discounting a plaintiff's subjective complaints

of pain as long as the decision is supported by substantial evidence. See Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591–92 (2d Cir. 1984).

Plaintiff argues that the ALJ's failure to specifically discuss all seven credibility factors under SSR 96-7p requires remand. (Pl.'s Br. at 11–14.) Yet the ALJ is not required to discuss all seven credibility factors as long as she provides reasons for her credibility determination. See, e.g., Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order). And, as illustrated above, the ALJ did provide reasons for her determination. (R. 20.)

The medical evidence provided by Drs. Strasser and Golpariani also undermined Plaintiff's credibility. Dr. Strasser noted that Plaintiff had less and less need for chiropractic care as his treatment progressed. (R. 267.) At the time of his final visit with Dr. Strasser, in February 2013, Plaintiff exhibited only the following problems: mild muscle spasms in the neck and shoulders; normal cervical range of motion; mild loss of lumbar flexion; no gait changes; negative cervical compression; and negative straight-leg raise. (R. 267.) Also at the time of that final visit, Plaintiff was able to squat and pick up weights without pain. (R. 267.) Similarly, Dr. Golpariani's notes show that over the course of his treatment Plaintiff went from requiring pain-relieving

injections to managing his pain with medication alone. (R. 306, 310–311.)

Plaintiff's statements were at times inconsistent, which damaged his credibility. See SSR 96-7p, 1996 WL 374186, at *5 (explaining that one strong indication of credibility is the consistency of the claimant's statements, both internally and with other information in the record). During a psychological examination, Plaintiff stated that he was afraid to drive after his July 2011 accident, (R. 256); yet before the ALJ, he testified that he continued to drive. (R. 34.) Plaintiff testified before the ALJ that he did not perform any childcare for his four children, but during a psychiatric evaluation, he told a doctor that he did take care of his children, albeit with difficulty. (R. 275.) Moreover, Plaintiff told the ALJ that he could not work in part because his medications have the side effect of making him tired, (R. 43, 47), but told Dr. Golpariani that his medications were not giving him negative side effects. (R. 313.) Finally, Dr. McWilliams seemed to suspect Plaintiff of drug-seeking behavior, noting in his report that he declined to prescribe new pain medication after Plaintiff showed him "medications from five different medical providers and three different area codes." (R. 292–93.) For these reasons, Plaintiff's argument that the ALJ erred in evaluating his credibility is meritless.

None of the decisions Plaintiff cites conflict with this outcome. First, Plaintiff relies on Hamlin v. Barnhart, 365 F.3d 1208 (10th Cir. 2004), for the proposition that "a claimant's ability to engage in minimal activities of daily living is not evidence of an ability to work." (Pl.'s Br. at 11.) But in that case, the ALJ observed that the claimant drove infrequently and performed no house or yard work. Hamlin, 365 F.3d at 1221. Nevertheless, the ALJ denied disability benefits because the claimant watched television, which, according to the ALJ, required "significant attention and concentration . . . inconsistent with severe and intractable pain." Id. (internal quotation marks and citation omitted; ellipsis in original). This case is much different. Plaintiff admitted that he was able to drive locally, take care of his personal needs, and socialize with friends and family, among other things. (R. 34, 43, 45, 275.) But because of his alleged pain, he did not cook, clean, shop, or do laundry. (R. 261.) The ALJ properly used an all-things-considered standard, reviewing what Plaintiff could and could not do. (R. 17, 20, 21.) Critically, the ALJ factored in Plaintiff's gradual improvement, as noted in doctor's reports. (R. 289, 306, 310–11.) Plaintiff accordingly errs in suggesting that the ALJ highlighted some evidence and ignored others. (Pl.'s Br. at 11.)

Second, Plaintiff asserts that the ALJ erred by "pick[ing] and choos[ing] among the evidence, relying upon only that which support[ed] her ultimate decision." (Pl.'s Br. at 11); see also Gecevic v. Sec'y of Health & Human Servs., 882 F. Supp. 278, 286 (E.D.N.Y. 1995); Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983)). Not so. It is well established that "an ALJ is not required to 'reconcile every conflicting shred of medical testimony.'" See Falcon v. Apfel, 88 F. Supp. 2d 87, 90 (W.D.N.Y. 2000) (quoting Miles v. Harris, 645 F. 2d 122, 124 (2d Cir. 1981)). Indeed, as long as the record allows the Court "to glean the rationale of an ALJ's decision," the ALJ need not discuss "every item of testimony presented to him" nor "explain[] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Mongeur, 722 F.2d at 1040. Here, the ALJ has repeatedly stressed that her determination was made in light of all of the evidence available to her. (R. 17, 20, 21.)

In sum, Plaintiff's case hinges on the same basic assertion: The ALJ should have weighed the evidence differently. But that is not the governing standard. The Court's review is "limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009). Under this "very deferential standard of review," this Court must accept the

ALJ's findings of fact unless "'a reasonable factfinder would have to conclude otherwise.'" Brault v. Social Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (quoting Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis in original) (per curiam). Plaintiff's arguments have not cleared this high hurdle. Accordingly, the Commissioner's motion is granted, and Plaintiff's motion is denied.

<u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's motion (Docket Entry 12) is GRANTED, and Plaintiff's motion (Docket Entry 9) is DENIED. The Clerk of the Court is directed to mark this matter CLOSED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     August __15__, 2016
           Central Islip, New York